**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| CAMPAIGN LEGAL CENTER,<br><br>Plaintiff,<br><br>v.<br><br>FEDERAL ELECTION COMMISSION,<br><br>Defendant. | Civil Action No. 20-cv-01778-RCL |

**PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT AGAINST DEFENDANT**
**FEDERAL ELECTION COMMISSION**

Pursuant to Rule 55(b) of the Federal Rules of Civil Procedure, Plaintiff Campaign Legal Center ("CLC") respectfully moves for the entry of default judgment against Defendant Federal Election Commission ("FEC" or "Commission"). CLC brought this action on June 30, 2020, challenging the FEC's unlawful failure to act on Plaintiff's administrative complaint alleging violations of the Federal Election Campaign Act ("FECA"). Service was effected on July 1, 2020, and the FEC's deadline to file a responsive pleading was August 30, 2020. *See* ECF No. 5. The FEC has failed to appear, answer, plead, or otherwise defend this action as required by the Federal Rules of Civil Procedure, and the Clerk of Court entered a default against the FEC on September 13, 2020. *See* ECF No. 7.

For the reasons described below, entry of default judgment against Defendant FEC is appropriate because the uncontroverted evidence establishes that the FEC has failed to act on Plaintiff's administrative complaint, and that this failure to act is contrary to law. Pursuant to 52 U.S.C. § 30109(a)(8)(C), Plaintiff asks this Court to declare that the FEC's failure to act is contrary to

law and to direct the FEC to conform within thirty days. A proposed order is attached.

## STATEMENT OF FACTS

1.      On December 19, 2019, CLC filed with the FEC an administrative complaint showing that Iowa Values, a tax-exempt corporation organized under section 501(c)(4) of the Internal Revenue Code, had violated FECA by failing to register as a political committee and file reports disclosing its contributors, expenditures, and debts. *See* Declaration of Richard A. Graham ¶ 3, attached hereto; Admin. Compl., FEC Matter Under Review No. 7674, attached hereto as Exhibit 1.

2.      Relying on publicly available information about Iowa Values's own statements, fundraising appeals, and digital advertising, CLC's administrative complaint establishes that, in June 2019, Iowa Values launched a "six-month voter education and data collection blitz" and "six-figure[]" digital adverting campaign targeting voters in Iowa as part of an "election-long effort" to support the reelection of Senator Joni Ernst. Ex. 1 ¶ 7.

3.      As detailed in the administrative complaint, Iowa Values began running advertisements on Google and Facebook on June 28, 2019, that directly named or pictured Senator Ernst and promoted her character as a "leader." *Id*. ¶¶ 8-9.

4.      Iowa Values's advertisements on Google's network stated, "We Deserve Leaders Who Share Our Values Like Joni Ernst." *Id.* ¶ 8. These ads ran from June 28 through July 27, 2019. *Id.* At the time that CLC filed its administrative complaint in December 2019, Google had not publicly disclosed the precise amount spent by Iowa Values on these ads but reported their aggregate value as falling somewhere between $1,300 and $53,000. *Id.* ¶ 8 & n.7.[1]

---

[1] Google's publicly accessible Transparency Report now reflects more precisely that Iowa Values spent a total of $30,300 for fifteen advertisements on the platform in 2019, all of which named and included images of Senator Ernst. *See* Compl. ¶ 24 & n.11 (ECF No. 1).

5.     Iowa Values also ran a Facebook video advertisement supporting Senator Ernst during the same time period in 2019. *Id.* ¶ 9 & n.8. The Facebook video ad featured footage of Senator Ernst and a voiceover stating, "We deserve leaders who have walked in our shoes and share these beliefs—like Joni Ernst. Standing up for Iowans all across our state." *See id.* At the time CLC filed its administrative complaint, Facebook disclosed the approximate cost of Iowa Values's ad as ranging between $1,000 and $5,000. *Id.* ¶ 9 n.9.[2] During this same period in 2019, Iowa Values also sponsored other Facebook advertising that included images of Senator Ernst as part of an effort to recruit canvassers in Iowa. *Id.* ¶ 9 & n.10.

6.     As cited in Plaintiff's administrative complaint, information available in Google's and Facebook's public ad archives shows that every advertisement Iowa Values sponsored on those platforms in 2019 named or featured Senator Ernst and/or directly pertained to Iowa Values's efforts on behalf of her reelection. *Id.* ¶ 14.

7.     Plaintiff's administrative complaint establishes that Iowa Values's advertisements on Google and Facebook, especially in light of their focus on Senator Ernst's character as a "leader" for Iowa, are susceptible to no reasonable interpretation other than as electoral advocacy for Senator Ernst, and that these ads substantiate Iowa Values's major purpose of reelecting Senator Ernst. *Id.* ¶ 26.

8.     Furthermore, CLC's administrative complaint documents that an individual fundraiser for Senator Ernst's campaign committee, Claire Holloway Avella, sent an email to a prospective donor in June 2019 soliciting funds on behalf of Iowa Values. *Id.* ¶ 10. The administrative complaint shows that the fundraiser's email attached a 2019 strategy memo

---

[2] Facebook's public Ad Library now discloses more specifically that Iowa Value's video advertisement supporting Senator Ernst cost between $3,000 and $3,500. *See* Compl. ¶ 25 & nn.12-13 (ECF No. 1).

prepared by Iowa Values, which described the organization's "focus" and "mission" as boosting Senator Ernst's reelection campaign. *Id.* ¶¶ 10-12.

9. The administrative complaint quotes Iowa Values's explicit statements, in its strategy memo, setting forth a detailed plan to target communications and outreach supportive of Senator Ernst to a key bloc of Iowa voters "that will be determinant in winning or losing in 2020." *Id.* ¶¶ 11-12.

10. The administrative complaint further quotes Iowa Values's own statements, in the strategy memo, describing suburban, college-educated women as "voters that lean Republican on the issues but lean away from the GOP at times on the tone of the GOP," and as "an irreplaceable part of a winning coalition [that] represent the 'firewall' between winning and losing in 2020 for Senator Ernst." *Id.* ¶ 12. In addition, Iowa Values's strategy memo explained that:

> The basis of our mission is to shore up those voters through sustained direct communications. We believe it is critical to start this messaging now in order to provide these voters with the information they will need to be able to fend off the disinformation attacks that will come in 2020.
> …
> We believe that there is critical work with segments of the electorate that must begin now in 2019 so that Senator Ernst has the best possible jumping off point in 2020.

*Id.* ¶¶ 12-13.

11. The administrative complaint establishes that Iowa Values's 2019 strategy memo is further evidence of the organization's major purpose of reelecting Senator Ernst, and that Iowa Values admitted to having such purpose in its communications to prospective donors. *Id.* ¶ 25.

12. Despite having the major purpose of reelecting Senator Ernst, as evidenced by its public statements and advertising, fundraising appeals, and strategy memo, Iowa Values failed to register as a federal political committee and file periodic reports with the FEC disclosing its contributions, expenditures, and debts.

13.     On December 27, 2019, the FEC sent CLC a letter acknowledging receipt of the administrative complaint and designating it MUR 7674. *See* Letter from Jeff S. Jordan, Assistant General Counsel, Federal Election Comm'n, to Brendan Fischer and Margaret Christ, Campaign Legal Center (Dec. 27, 2019), attached hereto as Exhibit 2; Graham Decl. ¶ 8.

14.     Since receiving the FEC's acknowledgment of receipt of the administrative complaint on December 27, 2019, CLC has received no further communications from the FEC regarding MUR 7674. *See* Graham Decl. ¶ 8.

15.     CLC waited more than 190 days for the FEC to take action on its administrative complaint before filing this action on June 30, 2020.

16.     To date, more than 270 days have passed since CLC filed its administrative complaint, and the FEC has still taken no action on MUR 7674. *See* FEC, Enforcement Query System, https://eqs.fec.gov/eqs/searcheqs (search for "MUR 7674" yields no relevant documents).

17.     On July 3, 2020, two days after CLC served the Complaint in this action, the FEC lost a quorum of commissioners for the second time in less than a year. *See* Letter from Caroline Hunter, FEC Commissioner, to President Donald Trump (June 26, 2020), https://www.fec.gov/resources/cms-content/documents/Caroline_C_Hunter_Resignation_Letter_to_White_House_June_26_2020.pdf (resigning effective on July 3, 2020).

18.     Without a quorum, the FEC is unable to "launch any new investigations, issue any advisory opinions, promulgate any rules, or render any decisions in pending enforcement actions." Ellen L. Weintraub, *The State of the Federal Election Comm'n* (Nov. 1, 2019), https://www.fec.gov/resources/cms-content/documents/2019-11-01-State-of-the-Commission-ELW.pdf; 52 U.S.C. § 30106(c).

19.     Even before the loss of its quorum in July 2020, the FEC was "plagued" with "ideological obstruction." Ellen L. Weintraub, *The State of the Federal Election Comm'n: 2019 End of Year Report* at 1 (Dec. 20, 2019), https://www.fec.gov/resources/cms-content/documents/2019_State_of_the_FEC.PDF. Because of this obstruction, the FEC has "frequently closed matters without so much as making a phone call to investigate potential wrongdoing" and "[e]nforcement actions pending before the Commission languished for months or years . . . causing some to near the end of their statutory limitations," only for "Commissioners to then decline to investigate at all," or for the Commission "to end up with inadequate outcomes years too late to make a meaningful difference to the public." *Id*. at 2.

20.     Between 2006 and 2016, the rate at which the FEC deadlocked on substantive votes regarding enforcement matters grew from 2.6% to 30%. Office of Comm'r Ann M. Ravel, *Dysfunction and Deadlock: The Enforcement Crisis at the Federal Election Comm'n Reveals the Unlikelihood of Draining the Swamp* at 1 (Feb. 2017), https://beta.fec.gov/resources/about-fec/commissioners/ravel/statements/ravelreport_feb2017.pdf. As a result of deadlocks, the FEC has routinely failed to investigate serious allegations of campaign finance violations and has closed matters without resolution. *Id.*

21.     The FEC remains in default with respect to this action, and the Commission has not appeared, filed an answer, or otherwise defended in the action to date. *See* Graham Decl. ¶ 8.

22.     Plaintiff CLC has incurred $400 in costs, as defined under 28 U.S.C. § 1920, in seeking this default judgment. *See* Graham Decl. ¶ 10; ECF No. 1 (docket text showing receipt of payment for filing fee).

**LEGAL STANDARD**

## I.     Default by the Government under Rule 55

A plaintiff may seek default judgment in a suit where the defendant fails "to plead or otherwise defend." Fed. R. Civ. P. 55(a)-(b). But "[a] default judgment may be entered against the United States, its officers, or its agencies only if the claimant establishes a claim or right to relief by evidence that satisfies the court." Fed. R. Civ. P. 55(d). Although default against the government is disfavored, Rule 55(d) does not "'relieve the government from the duty to defend cases or obey the court's orders.'" *Payne v. Barnhart*, 725 F. Supp. 2d 113, 119 (D.D.C. 2010) (quoting *Alameda v. Sec'y of Health, Ed. and Welfare*, 622 F. 2d 1044, 1048 (1st Cir. 1980)). "In determining whether the default judgment against the government is proper, the court may accept as true the plaintiff's uncontroverted evidence," *Payne*, 725 F. Supp. 2d at 116, including public record evidence, *see Doe v. Democratic People's Republic of Korea Ministry of Foreign Affairs Jungsong-Dong*, 414 F. Supp. 3d 109, 120 (D.D.C. 2019); *see also, e.g.*, Order, *Citizens for Responsibility and Ethics in Washington v. FEC*, Case No. 1:19-cv-02753-RCL (D.D.C. Apr. 9, 2020) (granting motion for default judgment where plaintiff demonstrated, "by evidence that satisfies the Court, that the FEC's failure to act on the administrative complaints . . . is contrary to law"). Where, as here, default has been entered against the government, "the quantum and quality of evidence that might satisfy a court can be less than that normally required." *Alameda*, 622 F.2d at 1048.

## II.    Contrary to Law Standard

A plaintiff is entitled to relief where the undisputed facts show that the FEC has acted "contrary to law" by unreasonably delaying action on the underlying administrative complaint. 52 U.S.C. § 30109(a)(8)(c). While FECA "does not require that an [enforcement action] be

completed within a specific time period," *DSCC v. FEC*, No. Civ. A 95-0349-JHG, 1996 WL 34301203, at *1 (D.D.C. Apr. 17, 1996), it does impose "an obligation to investigate complaints expeditiously," *id.* at *4; *see also Common Cause v. FEC*, 489 F. Supp. 738, 744 (D.D.C. 1980) ("Where the issue before the Court is whether the agency's failure to act is contrary to law, the Court must determine whether the Commission has acted 'expeditiously.'").

In determining whether the FEC has acted "expeditiously," the Court may look to "the credibility of the allegation, the nature of the threat posed, the resources available to the agency, and the information available to it, as well as the novelty of the issues involved." *Common Cause*, 489 F. Supp. at 744. In addition, the Court may consider the factors outlined in *Telecomm. Research & Action Ctr. v. F.C.C.*:

> (1) the time agencies take to make decisions must be governed by a rule of reason[;] (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and (6) the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed.

750 F.2d 70, 80 (D.C. Cir. 1984) ("*TRAC*") (internal quotation marks omitted).

Although the FEC's decision whether or not to investigate "is entitled to considerable deference, the failure to act in making such a determination is not." *DSCC*, 1996 WL 34301203, at *4.

## ARGUMENT

Under the *Common Cause* and *TRAC* factors, the undisputed evidence demonstrates that the FEC has unlawfully failed to act on Plaintiff's administrative complaint. Plaintiff is thus

entitled to a default judgment against the FEC under Rule 55 of the Federal Rules of Civil Procedure.

## I. Plaintiff's Administrative Complaint Credibly Alleges that Iowa Values Violated FECA

Plaintiff's administrative complaint provides substantial evidence that Iowa Values's major purpose was supporting the reelection of a federal candidate, Senator Joni Ernst, and therefore the organization's failure to register as a political committee and disclose its contributions, expenditures, and debts violated FECA. Administrative complaints filed with the FEC are credible where they contain "specific documentation of the amounts spent and the purposes of the spending," along with specific evidence as to the violations alleged. *Citizens for Percy '84 v. FEC*, Civ. A No. 84-2653, 1984 WL 6601, at *3 (D.D.C. Nov. 19, 1984).

Plaintiff's administrative complaint provides specific evidence that, in 2019, Iowa Values solicited contributions and made expenditures in excess of $1,000 on digital advertising for the purpose of supporting the election of Senator Ernst, and that Iowa Values professed in statements and fundraising appeals that its "mission" and "focus" was to help Senator Ernst win reelection in 2020. *See* Ex. 1 ¶¶ 5-14. This evidence demonstrates that Iowa Values's major purpose was federal campaign activity, and consequently the organization qualified as a federal political committee under the standard established by 52 U.S.C. § 30101(4) and *Buckley v. Valeo*, 424 U.S. 1, 79 (1976). *See* Ex. 1 ¶¶ 15-23. Plaintiff's administrative complaint thus credibly alleges, and presents substantial evidence, that Iowa Values violated FECA by failing to organize and register as a political committee pursuant to 52 U.S.C. §§ 30102 and 30103, and by failing to file periodic reports with the FEC disclosing its contributors, expenditures, and debts pursuant to 52 U.S.C. § 30104.

## II.    The FEC's Delay in Acting on Plaintiff's Administrative Complaint Poses a Substantial and Ongoing Threat to the Electoral System

The conduct alleged in Plaintiff's administrative complaint constitutes a substantial and ongoing threat to the integrity of the election system since there is a significant likelihood that this type of illegal activity will continue, and even increase, in the absence of effective enforcement. *See Percy*, 1984 WL 6601, at *3 (finding that "[t]he significance of the threat to the integrity of the [] election" is "obvious" where there is a "likelihood" that the illegal activity will continue); *see also DSCC*, 1996 WL 34301203, at *5 ("The threat to the electoral system is highlighted not only by the amounts of money involved and the impact upon close elections, but by the serious threat of recurrence.").

Undisclosed campaign contributions and expenditures undermine America's democratic system by denying the electorate necessary information about precisely who is advocating for and against candidates for federal office. FECA's disclosure requirements for political committees not only ensure that voters and candidates are able to evaluate campaign messaging and identify the sources behind it, *see Citizens United v. FEC*, 558 U.S. 310, 369-70 (2010), but also are critical to enforcing other aspects of FECA, including the statute's prohibition against foreign national spending in U.S. elections, its contribution limits, and its restrictions on coordination between candidate campaigns and outside groups, *see Buckley*, 424 U.S. at 56-58. Furthermore, the nature of the threat to electoral integrity is substantial where, as here, the conduct alleged is contrary to one of the principal purposes of FECA—ensuring comprehensive public disclosure of contributions received and expenditures made by political committees. *See DSCC*, 1996 WL

34301203, at *5 (finding that the underlying matter involved a substantial threat when it "involve[d] allegations" concerning "one of the principal purposes of FECA").

### III. The FEC's Failure to Act on Plaintiff's Administrative Complaint Is Not Excused by Lack of Resources, Competing Priorities, or Lack of Information

Because the FEC has failed to appear in this action, the Commission has put forward no evidence that its failure to act is the result of lack of resources, competing priorities, or lack of information. *Cf. Common Cause* 489 F. Supp. at 744; *TRAC*, 750 F.2d at 80. Indeed, the evidence provided by Plaintiff in its administrative complaint, which relies on Iowa Values's own statements and public information available in Google's and Facebook's ad archives, is more than sufficient to allow the FEC to proceed expeditiously. *See Percy*, 1984 WL 6601, at *4 (finding agency's delay unreasonable where "[m]uch of the information in the complaint could be verified from the FEC's own records."). The FEC has thus failed to carry its burden of showing that its delay in acting on CLC's administrative complaint is reasonable. *See id.* (placing the burden of showing lack of resources on the FEC because "knowledge as to the limits of [agency] resources is exclusively within control of the Commission").

Moreover, "[w]hatever deference an agency is due in resource allocation decisions, it is entitled to substantially less deference when it fails to take any meaningful action within a reasonable time period." *DSCC*, 1996 WL 34301203, at *5. Here, the FEC has failed to take *any* official action on Plaintiff's complaint for over eight months—a delay that is unreasonable.

Finally, even if the FEC's failure to act were due to the press of other business, a ruling for Plaintiff will provide the Commission an opportunity to relieve its burden rather than add to it. Congress included an alternative enforcement mechanism in FECA, authorizing private actions against administrative respondents when the FEC does not or cannot act. *See* 52 U.S.C. § 30109(a)(8)(C) (authorizing private right of action in federal court against administrative

respondent should the FEC fail to conform to the court's judgment within thirty days). If the FEC fails to conform due to its prioritization of other matters, or for any other reason, FECA authorizes Plaintiff to file suit against Iowa Values. Notably, that outcome would ease the Commission's enforcement burden and would avoid any concern about "the effect of expediting delayed action on agency activities of a higher or competing priority." *TRAC*, 750 F.2d at 80.

## IV.     Plaintiff's Complaint Does Not Raise Novel Issues

The registration and reporting requirements for political committees under FECA have been in effect since the mid-1970s, and the "major purpose" analysis for determining whether an organization constitutes a federal PAC was formulated in *Buckley v. Valeo*, a Supreme Court decision from 1976. The FEC has regularly engaged in major purpose analyses over the past four decades, and Plaintiff's allegations that Iowa Values failed to register and report as a political committee as required by FECA are by no measure a "novel" issue. *See Percy*, 1984 WL 6601, at *4 (finding that issues that make up a substantial amount of the Commission's workload are not "novel"); *see also, e.g.*, *Crossroads GPS*, FEC MUR 6596, https://www.fec.gov/data/legal/matter-under-review/6596/ (last visited Sept. 16, 2020); *Found. for a Secure and Prosperous Am.*, FEC MUR 6974, https://www.fec.gov/data/legal/matter-under-review/6974/ (last visited Sept. 16, 2020); *Comm'n on Hope Growth and Opportunity*, FEC MURs 6391 and 6471, https://www.fec.gov/data/legal/matter-under-review/6391/, https://www.fec.gov/data/legal/matter-under-review/6471/ (last visited Sept. 16, 2020).

Accordingly, the FEC is highly familiar with the relevant law and analysis regarding alleged violations of 52 U.S.C. §§ 30102, 30103, and 30104, and the issues raised in Plaintiff's administrative complaint are not novel.

## V. The FEC's Delay Violates the "Rule of Reason" and Runs Contrary to Congressional Intent that the Commission Act Expeditiously

The FEC's delay in acting on Plaintiff's administrative complaint is unreasonable. Although "Congress did not impose specific time constraints upon the Commission to complete final action . . . it did expect that the Commission would fulfill its statutory obligations so that [FECA] would not become a dead letter." *DSCC*, 1996 WL 34301203, at *7. While courts have declined to find that the FEC must act on every complaint within 120 days or within an election cycle, *see FEC v. Rose*, 806 F.2d 1081, 1092 (D.C. Cir. 1986), this "is not the equivalent of unfettered FEC discretion to determine its own time line." *DSCC*, 1996 WL 34301203, at *8. Indeed, the multitude of "*short* deadlines governing the speed with which such complaints must be handled," *Rose v. FEC*, 608 F. Supp. 1, 11 (D.D.C. 1984) (emphasis in original), itself demonstrates that Congress expected enforcement actions to advance expeditiously. This is because "[t]he deterrent value of the Act's enforcement provisions are substantially undermined, if not completely eviscerated, by the FEC's failure to process administrative complaints in a meaningful time frame." *DSCC*, 1996 WL 34301203, at *8; *see also In re Am. Rivers & Idaho Rivers United*, 372 F.3d 413, 418 (D.C. Cir. 2004) (finding that an agency's unreasonable delay "signals the breakdown of regulatory processes") (internal quotation marks omitted).

The FEC's failure to take any official action on Plaintiff's administrative complaint for over eight months signals a regulatory breakdown. Furthermore, the FEC's loss of a quorum in July precludes the agency from authorizing and advancing an investigation regarding the allegations in the administrative complaint. *See supra* Statement of Facts ¶¶ 17-18.[3] Until

---

[3] Although President Trump just yesterday nominated Allen Dickerson to be a member of the FEC, Mr. Dickerson's nomination has not yet been considered or confirmed by the Senate. *See* Press Release, White House, Three Nominations Sent to the Senate (Sept. 16, 2020), https://www.whitehouse.gov/presidential-actions/three-nominations-sent-senate-091620/ (announcing nomination of Allen Dickerson to the FEC). And it is uncertain when the Senate will

additional commissioners are confirmed by the Senate, the FEC can take no meaningful action on Plaintiff's administrative complaint. And even when it has had a quorum, the FEC's record of enforcement has declined in recent election cycles due to deadlock among the commissioners. *See supra* Statement of Facts ¶¶ 19-20. At this time, it appears that the only mechanism for ensuring the allegations in Plaintiff's administrative complaint will be investigated and adjudicated in a reasonable time frame is an order from this Court requiring the FEC to conform, the failure of which will allow Plaintiff to avail itself of FECA's private right of action. *See* 52 U.S.C. § 30109(a)(8)(C).

## VI.     The FEC's Delay Prejudices Plaintiff and the Public

The FEC's failure to take action on Plaintiff's administrative complaint damages the public's confidence in our election system by allowing apparent violations of FECA to go uninvestigated and unredressed. Likewise, the lack of enforcement and legal consequences for breaking federal campaign finance law emboldens Iowa Values, and others who might seek to emulate that organization's activities, to continue to flout FECA's requirements. *See DSCC*, 1996 WL 34301203, at *8 ("[T]hreats to the health of our electoral processes [] require timely attention . . . [and] should not be encouraged by FEC lethargy"). Because the FEC has failed to act on CLC's administrative complaint, CLC and the electorate at large will continue to suffer harm as a result

---

consider Mr. Dickerson's nomination. Indeed, the last time that President Trump announced his intention to nominate an FEC commissioner, 978 days passed before the nominee was confirmed. *Compare* Press Release, White House, President Trump Announces Intent to Nominate and Appoint Individuals to Key Administration Posts (Sept. 12, 2017), https://www.whitehouse.gov/presidential-actions/president-donald-j-trump-announces-intent-nominate-personnel-key-administration-posts-10/ (announcing intent to nominate James E. Trainor III to be a member of the FEC), *with* Michelle Ye Hee Lee, *Senate confirms Trump appointee to Federal Election Commission, restoring panel's voting quorum for first time since August*, WASH. POST (May 19, 2020), https://www.washingtonpost.com/politics/senate-confirms-trump-appointee-to-federal-election-commission-restoring-panels-voting-quorum-for-the-first-time-since-august/2020/05/19/de94796c-99e4-11ea-ac72-3841fcc9b35f_story.html.

of being denied critical information, to which they are statutorily entitled, regarding those who advocate for and against the election of federal candidates.

## CONCLUSION

Plaintiff's uncontested evidence establishes that Defendant FEC has acted contrary to law in failing to take action on the underlying administrative complaint. Plaintiff has standing to bring this claim and is entitled to an entry of default judgment against the Defendant. Thus, Plaintiff respectfully requests that the Court:

(1)    Enter judgment that the FEC's failure to act on Plaintiff's administrative complaint is contrary to law under 52 U.S.C. § 30109(a)(8)(A);

(2)    Order the FEC to conform to the judgment within 30 days pursuant to 52 U.S.C. § 30109(a)(8)(C); and

(3)    Award Plaintiff its costs of $400 incurred in this action pursuant to 28 U.S.C. § 1920. *See* Graham Decl. ¶ 10; ECF No. 1.


Dated: September 17, 2020                          Respectfully submitted,

                                                   /s/ Richard A. Graham
                                                   Richard A. Graham (DC Bar No. 1500194)
                                                   Erin Chlopak (DC Bar No. 496370)
                                                   Molly E. Danahy (DC Bar No. 1643411)
                                                   Campaign Legal Center
                                                   1101 14th St. NW, Ste. 400
                                                   Washington, DC 20005
                                                   Ph: (202) 736-2200
                                                   agraham@campaignlegalcenter.org
                                                   echlopak@campaignlegalcenter.org
                                                   mdanahy@campaignlegalcenter.org